and his official capacity as the Secretary of Health and Human Services at Elk. Mr. Smith for the appellants, Ms. Merriman for the accolades. May it please the Court, I'd like to address three points this morning which I'll summarize briefly. First, there have been developments during the course of this appeal that resolve the presentment-related issues and open the door to the resolution of the other issues in the case. Second, that this Court should resolve those issues. And third, the merits of them. During the pendency of this appeal, all of the plaintiff hospitals have filed claims for payment and have appealed the determination as to payment on the same legal issue presented in this case, and only on that ground. To the agency... Have appealed it where? Administratively, to HHS. Are you doing this before the Provider Reimbursement Review Board? Or what process are you guys using? This is the first step. There's 30 days for an initial determination by Medicare counsel, and then there are 60 days to request redeterminations, and then there's a process that goes on further than that. It's set out at 42 CFR 405.904. How does that help you, though? The presentment problem you have is there's no final decision, assuming that applies in this context. That's equally true now with administrative proceedings ongoing as it was when the appeal started. It helps in two respects, both as to presentment and as to exhaustion. As to presentment, the law is that jurisdictional defects generally can be cured during an appeal. This Court's NOVAC decision at 452 Fed 3rd, it's not cited in the brief. But the jurisdictional defect is the lack of a final agency decision on this point, correct? Yeah, that presentment and exhaustion. Presentment is the jurisdictional issue. Exhaustion, completing the process when it's futile, is waivable. I understand, but the requirement of a final decision goes to presentment, as I understand it, no? No, I don't think so, Your Honor. The cases suggest that there are two features of the requirement of a final agency decision. One is presentment, which is generally termed jurisdictional. The other is exhaustion going to the end. Presentment to the agency while the agency process runs its course. No, Your Honor. Presentment is accomplished when you present the claim. I mean, your perspective on presentment is literally if all that happened was the claim was presented by a letter, presentment's over with and jurisdiction's established. Everything after that is getting to a final decision, and all of that goes to exhaustion. That's the way you view the world? If I followed you, I think so, Your Honor. The letter issue in this case is outside of the normal administrative claim presentment process. And that's a separate issue. And we think because it was the only place the claim could actually be considered, that Action Alliance demonstrates that there is some flexibility in what is sufficient presentment. And we argue that when you do it in the only way possible, you've succeeded. But that issue does not need to be addressed here. On this presentment point, so there are cases like Matthews v. Diaz that say that something can happen while a case is pending on appeal to effectively correct a jurisdictional problem. In that case, though, the corrective action had taken place before the district court at a time when the district court could have accepted an amended pleading. And then the question is, and maybe you have some cases that support this, but the question is does that same logic apply when, I think by, let's assume I agree with you that if everything that has happened today now had happened before the district court, you'd be fine. Then the question becomes, is it okay that the things that have happened co-state the district court's decision? What support do you have for the proposition that that's okay? Three things. Diaz says, yes, you're correct, that Diaz filed his claim after he filed the complaint, but in the district court. But the Supreme Court said it is not too late even now to cure the jurisdictional defect. I've approximated the end of it, but the beginning is a quote. 28 U.S.C. 1653 says that complaints can be amended at any stage, even on appeal, to cure just jurisdictional defects. And does that actually happen? Do complaints actually get, the complaint itself gets amended while a case is on appeal? In the Novak case in this court, 452F3rd, the claim was a claim for personal injuries, and jurisdiction was predicated on diversity. The case was dismissed on different grounds. When it reached this court, the court looked at the complaint and questioned whether there was complete diversity, inquired of the parties, and everyone realized there was not complete diversity. The plaintiff made a motion to dismiss the defendant who were destroying diversity. The court granted the motion. Which court? This court. All that material was presented to this court, even though it was the district court, proceeding out of the case? In that case, in the district court, jurisdiction was predicated on diversity. The jurisdictional issue did not come up. Right, it didn't surface until it comes on appeal. Everybody failed to see it. This court saw it, everyone figured it out, and then the plaintiff appellants moved to dismiss the non-diverse defendants, and this court granted that motion and moved to amend the complaint, and this court granted that motion and proceeded on because the jurisdictional defect had been cured. So would that suggest that there has to be motions before us in this case? No, I don't think so, Your Honor, although we surely filed one. I think the complaint has been constructively supplemented. It's black-letter law that complaints are constructively amended and constructively supplemented through the period of litigation, and so the court can find that. Is it black-letter law that that includes through the appeal? I'm sorry, I didn't hear you. Is it black-letter law that that includes while on appeal? What happens on appeal supplements what's going on in district court? That's what Novak was. That's a case you didn't cite? No, we cited Diaz, which says it is not too late even now, the Supreme Court speaking, to cure the jurisdictional defect. What's left of what I had thought was the general principle, which is normally you measure jurisdiction at the outset of the case? I think the principle really is that you measure jurisdiction through the entire litigation. This is somewhat the obverse of the rule, that jurisdiction can be lost during appeal. Sure, but there are also lots of cases that say jurisdiction must exist at the outset. Well, certainly for the case to proceed, but in this case the jurisdiction has been established. Even in the district court, as in Diaz, there was no jurisdiction at the outset. It sounds like basically then what happens with the world is the rule that jurisdiction is measured at the time of the complaint being filed only helps plaintiffs, because it sounds like the defendant can't destroy jurisdiction after the complaint has been filed, but it seems like the plaintiff can create jurisdiction after the complaint has been filed. Well, the plaintiff can create jurisdiction after the complaint has been filed. In Diaz, Mr. Espinoza filed his complaint, and the Supreme Court was clear about it, and then filed his claim, presented his claim, and that was taken to be sufficient to cure the jurisdictional defect. And I don't remember in Diaz had the action by Espinoza to create jurisdiction, was that an action that had been taken by the time of the complaint but just not referenced in the complaint, or was it an action that was taken after the filing of the complaint? After. After, okay. Yeah, and I don't know that it… But while the case was in the district court. And I don't know that it was taken to create jurisdiction. It had that effect. Correct. Yeah, I didn't mean to be pejorative. It was compliance with a rule, which was necessary for jurisdiction, as in the Novak case with the diversity issues. And as I said, Section 1653 is pretty clear that you can amend complaints to cure jurisdictional defects, which suggests a general recognition… What 1653 doesn't tell you is it does say that the complaint can be amended, but it doesn't tell you the timeframe of the actions that can be the basis of an amendment because it could be that, yeah, you can amend the complaint while the case is on appeal, but it has to be based on something that had happened already. But I take it to your point that you have this Novak case that apparently says otherwise. Yes, Your Honor. And, you know, to some extent, this is a matter of practicality is the wrong word, but it would be useful to simply require where there is no other issue about affecting other parties' rights, like line jumping in a first-filed situation, where there's no prejudice at all to the amendment, and where both parties agree that delay prejudices them. Here, the government has argued that in this closed environment of a revenue-neutral system, that if this Court were to find that the rule is invalid, providing a cure for that gets more complicated as the dollars in issue grow. The plaintiffs have demonstrated that they are hospitals who treat the poor. They are lifelines essential to underserved medical communities, and they operate on tight margins and provide services to people who desperately need them. Without these funds, $1.6 billion a year, that's an issue. It's pretty clear that these hospitals are going to have to pull back on what they are able to do for their needy populations. Are you aware of any case where we, Supreme Court, and other court of appeals, has allowed a preliminary injunction against a rule governing prospective payments under Medicare Part B? I'm not aware of one, Your Honor. I'm not aware of the opposite, either. I think I told you there were two developments. People challenge this Medicare Part B prospective. They do a lot of rules, Federal Register notices, every year on all of those aspects of Medicare Part B calculation. There's a lot. You can tell just by reading the statute. There's a lot of pieces. I've never seen one of those that's been challenged through the mechanism you're proposing here, both without coming straight to district court and, secondly, to get a preliminary injunction. I'm just wondering why we get these cases, multiple cases every year, challenging some facet of how they're calculating prospective payments. In most cases, there will be issues as to individual claims that aren't solely the central legal issue about the validity of the regulation. How they compute the Medicare fraction. That applies to that. It's going to be one computation for everybody. How they compute outlier payments. They're going to have the same rule for everybody. The math, when you plug the numbers, it will be different for different hospitals. But how they do it, I haven't seen them brought this way. I'm surprised. They certainly can be. Here, frankly, all the logic is in favor of it. The government explains that dealing with these issues down the line is difficult. I wonder why. Can you go to the Provider Reimbursement Review Board with these claims? I didn't hear you. Can you take a claim like this, like you have this year, starting when it kicked in in January 2018? You said you've presented the claims. Yes, we have. But could you go to the Provider Reimbursement Review Board and then, when it comes, ask for the expedited judicial review? Why isn't that the mechanism for this? Does it not apply to these claims? Because of the second development that I said I was going to tell you about. The government has filed, in another case pending in the district court, a pleading that assures the court that any appeal presented to the agency based on the invalidity of the regulation will be summarily dismissed. No, but that's exactly why the Provider Reimbursement Review Board provision allows for expedited judicial review. If the board determines that it has no capacity, no power to determine the legal claim, then it gives you a ticket directly to district court. But if exhaustion, if futility is evident way before that, exhaustion is excused. Here, the agency has not just said we're bound by the rule that all decision makers have to apply this rule. The agency told the court in its filing that it has no jurisdiction to even consider the challenge. How much are the individual claims? Do you know what they're seeking? I don't. They would be claims for reimbursement of particular drugs. I'm sorry? They would be claims for reimbursement of particular drugs. They're submitted regularly throughout the year. And is that the only argument that would be made with respect to reimbursement on those drugs? Because sometimes there's other arguments about the drugs. Is this the only one that would be made? Yes. Or might they have some other challenges to raise as well? None. The relevant documents are in the very brief appendix to the reply. Pages 1 and 2 are the government's pleading, saying that it will not consider these appeals, that there is no administrative avenue, no administrative door that's open. And the following few pages are the documents that make the claim and present the legal issue, and you'll see that they've been denied. I'll get some water. So with these two developments, I think it's clear that these plaintiffs have done everything they can do. If challenging the proposed rule in the rulemaking system was not sufficient to provide jurisdiction, they have now filed administrative claims for payment. They've been denied, and the government has made it clear that it will not consider any further challenges. It would virtually be, if you could analogize it to a court proceeding, a Rule 11 violation to make them. They've said they won't consider them, and we say, and you can see it in the addendum to the reply, we say the only issue here is the operation of the formula, the rule. There is no, we do not raise any dispute as to any other issues. All right, so moving to the preclusion issue, Amgen states the standard for preclusion, and Amgen indicates that there will be no preclusion unless, quote, the wording of a, when, there will be no preclusion when the wording of a preclusion clause is less than absolute. So we can give you some time in rebuttal, if you want to reserve some time for rebuttal. Yeah, I've reserved three minutes. Yeah, we'll give you time back in rebuttal, and we'll have it from the government, and then we'll give you time back for rebuttal. Yes, Your Honor. Okay, thank you. Thank you. May it please the Court, Laura Myron for the government. I'd like to address the presentment questions that have been raised, but with the Court's indulgence, I'd like to start with the preclusion of review question because the limitation of review in Section T12, which is on page A3 of our brief, precludes not only administrative but also judicial review. So as has been said, the claims don't go through the provider review board because there's no administrative review of these kinds of challenges to the payment rates that the Secretary sets for services and drugs under the outpatient prospective payment system. And I can walk through briefly the three provisions that demonstrate that that's true. They are T2, which is the Secretary's general authority to set up the classification system, set payment rates, and adjust those rates. T14, which gives additional instruction on how the Secretary shall set rates for certain classes of drugs. And then T12, as I mentioned, which is the general preclusion of review provision. So doesn't your argument, if I follow this scheme, depends on our viewing 14 as a subset of 2 rather than as a separate freestanding program? Yes, Your Honor. What the Secretary is doing under T14 is an implementation of his T2 authority. And if I may, we know that because what the T14- So just historically, I'm curious. I assume that before Paragraph 14 sets up a special scheme for SCODs, specially covered outpatient drugs, all of those drugs were assessed and reimbursed as outpatient drugs under Paragraph 2. That's correct. There's also a provision that was added in between the initial establishment of the OPPS system and this inclusion of T14, which provides for what are called pass-through payments for new drugs. But that's something separate. And sort of the general classification of establishing groups of drugs that are comparable clinically and with regard to use of resources and then setting and adjusting payment rates for those drugs, which is what the Secretary does under T2. So for the drugs that are now SCODs under 14, are they still assessed for other purposes under 2 and the general provisions, or is it now just if it's that drug, it's just under 14 and nothing else? Well, so what T14 does is provides an instruction to the Secretary on how to establish the rate for certain drugs. For certain programs. For certain drugs, yes. And those are the drugs for which, in B, it says, a separate ambulatory payment classification group has been established. So the way that it works is that the Secretary, under his T2 authority, sets up the classification groups, and then once he has a group for this kind of drug, T14 provides some clarification on what the payment rate should be for those drugs. Why shouldn't we view the schemes as distinct just given, if you look at what cross-references are and what cross-references are not in the scheme, so you have your general provision in 2 has cross-references to 5 and 6 but not to 14. The preclusion provision makes reference to 2 but not 14, and 14 makes no reference back to 2. Why doesn't that at least support a colorable argument that 14 is really something distinct? So if I could take that in two parts, the first being that what Section 2 says is that the Secretary, and this is in Provision E, which is on A2, the Secretary shall establish in a budget-neutral manner adjustments under Paragraph 5 and Paragraph 6, which are, as I said, separate payments that are not part of the general classification system, and then it says, and other adjustments as determined to be necessary to ensure equitable payments. So it's perfectly reasonable for Congress to think that that covered its additional instructions to the Secretary on how to set 2E, which is on A2. It's a general grant of authority to make adjustments to payment rates under his T2 authority, and so I don't think there was any need for Congress to back-reference T14 because it already had a catch-all provision. Sorry. So what's the relationship between that provision, which talks about adjustments, and 9, which also talks about the Secretary making adjustments and also has the budget neutrality requirement? So if I may, Section 9 is a general authority to periodically review the rates as they've been set, and the Secretary does that annually. And if you actually take a look at the rulemaking that's at issue in this case, at the outset the Secretary says, I am invoking my T9 authority to periodically review and adjust. But then within the sort of general scheme, there are specific adjustments that the Secretary is authorized to make with regard to specific kinds of payments, and that is the kind of thing that's covered in the catch-all provision of T2 and then also referenced in T14. So your position, the language that you've cited in 2E you say should not be limited to 5 and 6 even though it follows references to 5 and 6, and therefore I assume you would take the position that the Secretary's action here is independently supportable under 2E and under 9, under both? Yes, Your Honor. Okay. And I believe if I could get back to also your earlier question about why there isn't a cross-reference in T12 as well. So the provisions that are outlined in T12 are sort of general authority that the Secretary has at the outset to set up the system and various conversion factors and payments that are involved in that. And just as an especially confusing matter, what it says in C is paragraph 6, but what they mean is paragraph 9, and if you look at the statutory history, that's evident. And they added in 2000, excuse me, I believe 1999, paragraphs 5 and 6 in 12E, but that's because those are, as I said, separate payment authorities that the Secretary has to make additional payments outside of his general T2 authority to develop the classification system and set rates. And so it's perfectly reasonable that they would have specifically cross-referenced those provisions, but not added a specific cross-reference. Sorry, so why would you say the payments in 5 and 6 are outside the scope of 2, but not the payments in 14? Because as I said, 14 says it doesn't give the Secretary authority to make new payments. What it says is for the class of drugs that is covered under this provision, the payment rate shall be as follows, and then give some additional instruction on how the Secretary shall set the rate for that payment. It's not a new payment of any kind outside the T2 classification system. It's a clarification on how. Is there anything that happens under 14 that's not covered by 2? We think that what the Secretary did here under 14 is equally justifiable under T2E, which gives the Secretary the authority to adjust. For the Venn diagram, is 14 wholly subsumed by 2? 14 provides specific instruction on how to do a specific part of 2, so it is a clarification. So in other words, nothing the Secretary could do under 14 that wouldn't already be covered by 2? Yes, Your Honor. Is that right? Because 2E is adjustments to ensure equitable payments, whereas the adjustment under 14 is to adjustment as necessary for purposes of this paragraph. So those seem to me actually different purposes. And so it actually seems at least ambiguous to me that Congress would have meant the one to cover the other. So if I could, I think part of what's driving your question is perhaps what are the purposes of this paragraph. And the purposes of the paragraph is just textual. Congress uses different language and can find the adjustment as to a necessity judgment under that paragraph, which it didn't do under E, which would mean, in fact, the powers are not the same. Right. But the adjustment authority under E, which gives the Secretary broad authority to make any adjustments as determined to be necessary to make equitable payments, is, in fact, broader than anything that the Secretary— Was this an adjustment to ensure equity? Equitable payments? How is this an adjustment to ensure equitable payments? So what the Secretary is doing here, and I think this addresses a little bit the question about what the purposes are of this paragraph, and perhaps if I could, before I get to that, say that part of what I think is confusing about this case is that the appellants have characterized the 340B program as a discount plus a subsidy under the Medicare reimbursement rate, plus a reimbursement under the Medicare provision in order to create a subsidy. But that's not how it works. It's just a discount. It's a totally separate statutory provision under which certain providers can buy drugs at a discounted rate, which allows them to stretch their dollars further. The Medicare reimbursement rate at issue here applies to a small category of those drugs that are paid under the outpatient prospective payment system, and what the Secretary is doing when he's setting that rate has nothing to do with the price of—with the 340B discount. What the Secretary is doing is setting the rate under the Medicare statute, which directs him to set the rate as equal to either, one, the acquisition cost if certain survey data is available, or two, if that data is not available, to use the average price of the drug as set by a different provision of the statute. But the price in question is the sale of the drug from the manufacturer to the provider. So what Congress is trying to get at is a number that approximates the acquisition cost of those drugs. And the problem that CMS was addressing here is that the average sales price as calculated by CMS doesn't account for the 340B discounts. And there's been a number of studies that have demonstrated that 340B providers are buying these drugs at well below not only the average sales price but also the statutory maximum price under the 340B program. So the Secretary adjusted the reimbursement for those drugs in such a way that better reflects the actual acquisition cost of those drugs to providers. And that not only addresses the purposes of the paragraph, which is to approximate acquisition costs, but also is an equitable payment because that money is redistributed through the rest of the OPPS system and affects the copayments that Medicare beneficiaries are paying, which is tied to the – statutorily tied to the Medicare reimbursement rate. So can I ask you on the – oh, sorry, on the preclusion of review, so this is 12A. Yes. That's the principal provision you're relying on, right? Yes. And so your argument, as I understand it, is that everything that happens within 14 is necessarily subsumed within 2, and so there was no reason to mention 14 separately even though there's other provisions that mention a lot of other paragraphs separately. Yes, Your Honor. Okay. There's a question about whether that's, in fact, true about it being completely subsumed within. But it also – two questions. First, what are the other paragraphs that are completely subsumed within 2 because I suppose it's not just 14. Nine I think you mentioned, but maybe there's others too. And then secondly, it speaks in terms of the development of the classification system, and it sounds like a lot of these questions about what happens under 14 at least, it doesn't sound in development. It sounds in application or in implementation or something like that. So first of all, 2 speaks in terms not only of the development of the classification but also the setting of relative payment weights, the making of wage adjustment factors, the other adjustments to the payment rates. And what Congress is getting at is – I'm sorry. I'm sorry. Before you go on because I want to make sure I'm reading this right. Yes. When you say it includes those other things, so you're reading those as distinct parts of the list and not part of the including list in that text? So – One way is it's a first clause and then everything including and everything after it is including. But including as part of the classification. And what you're saying is it's classification and wage adjustment factors are not part of classification. So they are in a sense part of the general development of the system that the Secretary makes at the outset. But how it works is that the Secretary takes account of all of the drugs and services that are covered under the outpatient prospective payment system and classifies them into groups and then sets relative payment weights and makes adjustments to those payment rates in the system. And the Secretary does this in a budget neutral manner and does it at the outset. It's intended to be prospective. It's intended to be budget neutral, to look forward, and to set the rate for the various services at which they will be paid throughout the year. So all of that is subsumed within the development of the system. The application of the system is the paying of claims at the rates set at the outset by the Secretary. And so – And that's outside the limitation of the review? Certainly you can get review of your claim if you think that you weren't paid enough money, if it was denied for failure to adequately justify the claim, any of those kinds of things. But what you cannot get review of under T12 is the rate at which the Secretary sets the payment for the year. And that's what they're trying to challenge here, and that's why it's precluded under 12 because that's part of what the Secretary is doing under his T2 authority is setting the rates for the year. And is there any way that they can get the challenge of the rate? Is your argument that that's just out of bounds, you can't get review of it, or is it that it's using the wrong vehicle? No, that is out of – you cannot get review of that, which is what Congress intended when it enacted T12. As this Court recognized in Amgen, you cannot get review of the payment rate that's set for the year. You can participate in the notice and comment process. Unless you think it's ultra-various. Yes, Your Honor, unless you think it's ultra-various. You can participate in the notice and comment. You can participate in the notice and comment for the following year that the rate was too low and should be higher for the next year, but you can't get judicial review of the payment rate, in part because, as I said, it's budget neutral, which means that any adjustment that's made to the payment rates by a backward-looking court would not only affect the rate for that drug and service, but also the entire OPPS system, which, as we noted in our brief, processes 100 million claims a year. If your view of the world is that two sets forth the general rules for establishing formulas, and then nine sets forth the general rules for adjustment, and 14 is subsumed into one or both of those, why didn't you invoke, for preclusion purposes, 12C, which immunizes periodic adjustments under nine? We certainly think that 12C covers what the Secretary did here, but because A is the... And wouldn't that take off the table, or would that take off the table, the question of initial setup design versus adjustment over time design? Yes, I think they both address the same thing, and so in this circumstance where the Secretary is using both his authority under T2 and T9 to establish the rates for 2018, that both of those provisions would preclude review of the rate set and adjustment here. I initially came in here thinking that you couldn't have relied on that because it says six, but this is the one that everybody apparently agrees that it's actually supposed to be nine. There's no question, if you look back at the statutory history, that they just didn't update the cross-reference that what is in paragraph nine now was previously in six, and it doesn't make any sense to have periodic adjustment under six. So I think it's fairly clear that it means nine, and certainly the preclusion of review provision in C also would cover what's going on here, and as this Court recognized in Florida Health Sciences, the fact that there are overlapping provisions, in fact, demonstrates that Congress really meant no judicial and administrative review here, and so... There would be an ultra-various exception to all of that, though. Yes, Your Honor, there is an ultra-various exception to all of that. We don't think that what's going on here is anywhere close to that. I would be happy to... What about their argument that this isn't an adjustment? I'm sorry? Because all of this depends on this being an adjustment, and so what's your response to their argument? This was way too big to be an adjustment. There's no size limitation on adjustment in the statute. The Secretary has the discretion to adjust as necessary. For purposes of the paragraph, courts have recognized that in some extreme instances where the adjustment actually amounts to an elimination of the payment, that that might be something that's considered ultra-various, and that was the analysis in Amgen. But there's no basis to conclude that when the Congress has given the Secretary to adjust as necessary, that that wouldn't cover the adjustment at issue here, which was in response to an enormous disparity between the acquisition cost of the drugs under the 340B program and the reimbursement rate that they were receiving under Section T14 in the OPPS system. And the Secretary also took account, as I said, of the fact that those savings would be redistributed throughout the system, and also that that rate affects the rate at which Medicare beneficiaries are required to pay a certain amount by statute in co-pay. And so taking account of that, they made an appropriate adjustment to reflect the disparity between, as I said, the acquisition cost and the actual discount that providers were getting. Does 14 by its terms contain any requirement of budget neutrality? I didn't find it. By the terms of 14, it does not, but the general adjustment authority is. This is just another manifestation of the principle that 14 has to be embedded in 2 and 9. Yes, Your Honor. Yes, Your Honor. Even to get budget neutrality. What the Secretary did here was consistent with budget neutrality and redistributed, as I said, those savings throughout the OPPS. The government's position, 14 must be budget neutral? The adjustment at issue here was budget neutral. That's not what I asked. So the authority to make adjustments under 9 does include a budget neutrality requirement, and the Secretary tries to adhere to that when making adjustments throughout the system. You're fudging a little bit. Come on. If you can't take a position, just tell me. I understand that. I'm not sure that they would say that all adjustments need to be budget neutral under 14. I would suspect that since the overarching authority requires budget neutrality that that may be true, but I can't say for sure that that's true. But, again, I think the view that I said before is that the Secretary invoked T14 authority, but everything that he did here could also have been done under T2, which does require budget neutrality, and it was budget neutral, which means that if this Court seeks to unscramble what the Secretary did in setting the 2008 rates, it would necessarily include all of... It just seems a little bit rich for the government to be saying, well, we have to fold 14 into 2 and 9 to get the benefit of preclusion, but we're not necessarily going to fold it into 2 and 9 to hold ourselves to budget neutrality. Well, as I said, the Secretary here did use that authority in a manner that was budget neutral, and I... I'm a little confused about the way you articulated one point just now, because you said it acted under 14 but could have acted under 2. I thought your point is that when you're acting under 14, you're necessarily acting under 2. Yes, Your Honor. I'm sorry if I misspoke. What I meant to say is that the Secretary invoked in the rulemaking his authority to set the rates at a certain level, as outlined in 14, but the general authority is derived from the T2 authority to set up the classification system and establish the payment rates within that system. Or 9. In other words, mention 14 in particular, but 14 is always an application of 2, and then is it always an application of 9 also? Only when it's a periodic adjustment. Yes, Your Honor. And not if the 14 is a periodic adjustment. When it's a budget neutral periodic adjustment. Yes, so it could be that the Secretary at the outset sets up a new classification system, and that would be a pure exercise of T2 authority, but not an adjustment under 9. What I'm trying to make sure that we button up is that 2 might be broader than 14 and 9, but 14 is not broader than 2. Yes, Your Honor. And 14 is also completely within 9, or no? Only some applications of 14 are 9 applications. I believe it's only some applications because it's all sort of mushed together to a certain extent. It's unfortunate that it's mushed together because we have to construe a limitation provision in order to understand that. Yes, Your Honor. What I was going to say is that Congress gave the Secretary the general authority to set up this system, and then also gave him the authority to invoke periodic adjustments to the system. And the actions that he's taking in setting up the system and making adjustments to it are very similar, if not identical. It's just sort of separate. At the beginning, you do this, and then when you intend to adjust periodically, you use your authority to— One thing you could sort of say in this realm, you can't agree with this, but is that if all these provisions kind of interrelate, kind of sometimes and sometimes kind of, and a lot of times they do, but then there's a sliver that stands outside, then in order to figure out whether a limitation on review provision applies, it could be pinned to what's actually invoked because then that indicates the Secretary's assumption that what the Secretary is doing is immune from review. Well, Your Honor, the Secretary did invoke T9 here at the outset of the rulemaking proceeding to reset the—to make adjustments. T9 for the authority, but not 12C for the preclusion. So as a general matter, he invoked his T9 authority, and so if the question is what authorities were invoked, I would point to that. If you think that that means that T12C applies, then certainly we think we would agree with that. And I think, as I said, 12C, because it lists a number of provisions, it seeks to address some of the concern you have by saying, okay, well, if it's this provision or this provision or that one, then it's all precluded because sometimes it's the development at the outset, and sometimes the Secretary will invoke his T9 as a periodic adjustment authority. But what he's doing is the same as what he's doing under T2, and so as a result, the whole thing is beyond the reach of judicial review. And I think that makes perfect sense and is consistent with how this Court viewed it in Amgen to say we don't take piecemeal review of these kinds of rates. In fact, we put all of this beyond the reach of judicial review. Okay. Let's just assume for a minute that we disagree with everything you've told us so far today, and we get to the other question, which is about presentment. Can I ask you about that? Yes. So as to that, what's your argument as to why DS doesn't allow us to take account of what's in the addendum to the Roe v. Wade? So I would – if I could say a couple of things. First, DS says when action has occurred, while the case was pending in district court, but the complaint wasn't technically amended, that we can, for purposes of review, all agree that it essentially was amended and move on. But it doesn't say that you can go past district court review of the merits or any of the other issues in the case and conclude that a jurisdictional defect can be cured before the Court of Appeals so that that court can resolve the questions that weren't passed on by the district court. It's a very limited – What's the difference? Why does it matter if it's pending in the district court versus the Court of Appeals if what we're talking about is hypothesizing an amendment that didn't, in fact, happen? Well, it allows the district court to consider – and I believe in that case, the district court did consider the issues before it, and then the Court of Appeals said, well, there may have been a jurisdictional defect at the time, but because the complaint could have been amended at that time, it had been cured, we will overlook as a formal matter the fact that – But why can't it be amended later given that statute that says defective allegations may be amended upon terms in the trial or appellate courts? So if I take your question, it could be amended, but it would have to go back to district court to review the merits of the question and the other – the preclusion of review question. I don't understand that because we know from Diaz that it doesn't have to go back to the district court. No, I think what Diaz says is that when the court has passed on these issues, but there was a latent jurisdictional defect that was later cured, that we can go on and pass on the issues that the district court decided. But it doesn't say that you can just skip – What do you mean by the district court? The district court didn't decide the jurisdictional issue in Diaz, right? No, but it did decide the merits questions. So what I'm saying is that if you think that the presentment at issue here has cured the jurisdictional defect that the district court ruled on, the case would go back to district court for the district court to rule on the rest of the issues that were presented because in this case, the district court only decided the presentment question, only decided the jurisdictional question. And so in any case, it would need to go back to district court for consideration of the merits. I mean, it seems like there's two different – you could always say that it should go back to the district court when it hasn't considered it because that's better for the system. I get that. But that's a question of discretion of whether we want to do that, which seems different from the question of whether there's, in fact, jurisdiction in the case at all and the district court ruled that there wasn't. And you're pressing that argument. And it's true that if we found there was jurisdiction, we could send it back. We could also send it back to perform what I think it seems like would be a pretty formalistic exercise of taking account of something that's in the addendum to the reply brief that everybody acknowledges is genuine. Is there a reason not to take stock of that for these purposes and just call that a presentment? So if you think that the – so first of all, they can't just cure the jurisdictional defect while the case is pending in the Court of Appeals and just go on their way. They would need to, if this court thinks that that action fixed the presentment defect and that they had adequately presented their claim to – Do you disagree with that? Do you think it didn't fix the presentment defect? It says we are – basically what the claims say is we are entitled to payment at a certain rate. It doesn't outline why they think payment is at a certain rate, so it doesn't specifically say that the Secretary should have – Because this seems – because I think the DS did say there was a stipulation so the Secretary agreed. So if you disagree, then that arguably takes it outside the box. I mean, are you – do you think that this isn't a DS situation because the document is not sufficient or – I do not think it is a DS situation in that everybody sort of agreed that it could have been amended in district court and it wasn't, and that is a technical error and we should just overlook it and allow the amendment of the complaint now. This is a different situation in which there is a question about whether what's been submitted actually satisfies the presentment requirement, and if this court thinks it does, then it could go back to district court to be amended, but – But do you think it does? I mean, because – or do you have – I mean, if you don't have a position – I don't have a position on whether it does or not. I don't think that it's as clear as plaintiffs are making it out to be that it does. As I said, it says we are entitled to payment at this rate. It does not actually flesh out any of the reasons why that might be true or present sort of the statutory arguments that might justify payment at one rate or another, and given that that's the case, that they don't – they have to go back to district court and address the additional questions in the case as well because – Before you get to that, just on the – are there – are there cases that specify how much they have to spell out legal arguments? Maybe they were assuming you all are on notice for what their position is. I'm just trying to understand this presentment argument that you're presenting. So I don't know exactly how fulsome it needs to be. My point is only that this is not a situation like Diaz where everyone is in agreement that presentment was satisfied when the case was in district court and that it was a – It was presented enough that it was denied, right? Yes. So from that standpoint, it's not like it was defective. If I could get to sort of the second part of it, the problem that all of this highlights is that HHS reads T12 to apply, and T12 also precludes administrative review. So they're not going – taking this claim before the provider review board because administrative review of this kind of challenge is precluded. So we could go back to district court and litigate these questions again, but we're asking this court to decide the preclusion of review question because it will be back here shortly thereafter even if the presentment question has been satisfied. Right, but I'm assuming that you lose on the – that's the whole premise of this is that you lose on that, and then the question is that you also lose on the presentment question. So if that's – if you think that – I'm not saying I necessarily think one way or the other. If you think that that's true, then that would also mean that the administrative review question is more difficult as well and that they're entitled to some additional measure of administrative review that they're not currently getting. So I'm not sure the complaint could be amended in a way that would satisfy the presentment and the exhaustion requirements because the HHS would have to begin providing additional administrative review for this kind of claim, which it's not currently doing. Would you agree at least that it's futile? Would you agree that no exhaustion is required here? No, I don't agree that it's futile. And specifically, as you mentioned and as we mentioned in our brief, Congress has provided a mechanism for review of claims that CMS or HHS cannot address in the administrative review process, specifically regulatory or statutory or constitutional claims. And there is an administrative review process for those that is expedited. And so even if – Is that the 1395-00? Yes, even if this claim is something that is as – by challenging a position of the Secretary made by regulation, they still need to go through that process, and that's well-settled Supreme Court law, that even if the agency can't give you the relief that you're seeking, you still need to go through the administrative process and exhaust your claim in the Medicare context. Thank you, counsel. I'm astonished that the government would question whether the presentment has If you look at page 12 of the addendum, the hospital has appealed on the following claim. The new rate violates 1395, the authority to pay for this drug, because it is not an adjustment to the statutory rate, is based on acquisition costs, reliable data are not available, and it was for the explicit purposes of reducing benefits provided by the statutory created 340B program. And that's a direct summary of the claim that was presented in the complaint below and that we're litigating here. As to futility, the pleading that the government filed said, if AHA member hospitals attempt to challenge non-reviewable determinations by filing administrative appeals with the Office of Medicare Hearings and Appeals, then OMHA will flag those filings and dismiss them promptly. It's absolutely clear that there is no door open within the agency. It's futility squared. It was futility before the government said this, because the decision-makers in the agency are bound to apply the new rule. And it's now futility squared because the agency has said there are no decision-makers who will even evaluate the argument. We don't have jurisdiction. Diaz took the complaint as constructively amended on appeal. As I've said, if you prefer a motion, we can file one. But futility, but presentment and exhaustion, I think, are as clear as they could possibly be. Tod Aronowitz in this court said, there's no reason to believe that the agency machinery will exceed to this claim ever. And clearly that's the case here. As to the preclusion, you've got to look at Paragraph 12. There are five subparagraphs. Every single one specifically names the paragraph in the statute to which it is applicable. If you look at Paragraph 12. What about the argument that two, that every application of 14 is necessarily an application of two, and therefore there was no reason to mention 14 separately? It's wrong. That argument, I believe, would actually make the preclusion clause on Paragraph 12 applicable to the entire OPPS statute because it's hard to read through any of these provisions and not see some connection with two. When, for example, Paragraph 12… There could be a difference between having some connection to two and being entirely subsumed within two. In other words, I thought the argument, just as a matter of architecture, was that everything that's ever done under 14 is necessarily an application of two, and therefore it's just no reason to mention 14 separately because you've already mentioned it by mentioning two. Whereas with the other provisions, they may touch on two, but they're not completely wholly subsumed within it. There's no cross-reference to Paragraph 2 and Paragraph 14, or vice versa. In this statute and the entire statute, the preclusion is identifiable in two ways. One, Paragraph 12 in one of its five subparagraphs specifically refers to another paragraph. And two, the other paragraph to which the preclusion is assertedly applicable refers back to Paragraph 2. Throughout the scheme, you can see that here and there, but the preclusion paragraph, but Section 2 does not apply to every decision that's made. And here, the Secretary clearly was acting, and said he was acting, under Paragraph 14, not Paragraph 2. When Paragraph 13 was added at the same time as Paragraph 14, Paragraph 13 included the language with a reference to Paragraph 2E because Congress intended that. Can I ask, on the cross-references, 14H has a cross-reference which says that adjustments under 14, after an initial period, are taken into account for adjustments under 9. And why doesn't that strongly support the government's position that initial setting under 14 is really part of 2 and later adjustments under 14 are really under 9? Well, Your Honor, this issue wasn't raised, and I'm not sure I have a cogent answer. We can brief it. But the adjustment authority that matters here under Paragraph 14 is defined. Congress defined how the adjustment was to work. Congress gave two options. I understand, but just on the preclusion question, a lot of the force of your position is in the cross-references that are or are not present, and it seems like that one cuts against you. But it's not part of the statutory specification of how you derive the formula, and it doesn't affect how you derive the formula. Right, which makes the point that what I just said doesn't bear on your argument about ultravirus, but it might well bear on preclusion to the extent preclusion turns on whether 14 is under 2 and 9 or is off by itself. Well, for one thing, H refers to 2004 and 2005, and then the subsequent years. Just don't? I do not believe the Secretary has authority to change the formula based on this provision. But as I say, this issue was not raised. What about the point that it goes under C as a periodic adjustment? Sorry? What about the argument that it goes under 12C as a periodic adjustment made under paragraph 9? Because the adjustment has to be an adjustment to sales price, average sales price. Average sales price is a market measure across the entire country. Paragraph 12C, periodic adjustments under 9, the periodic adjustments under 9 are not part of the derivation of the rate-setting formula under paragraph 14. The rate is set independent of paragraph 9, and the Secretary did not exercise paragraph 9 authority here to adjust the rate if it applies, which I don't think it does. I thought the government said that they did invoke paragraph 9. No, I think if you look at the final rule in the Federal Register, that's not accurate. I may be inaccurate, but I think it's not there. Thank you on this. It says 6, but it means 9. Have courts held that? Has any court held that 6 means 9? I'm not aware. How long has that mistake been on the books? I don't know. It's not a recent. Congress has been ignoring it. No, I think it was a codification error. So you? I'm just wondering how long it's gone and it hasn't been corrected. I don't know the answer. But you agree it's a codification error? It's supposed to be a reference to 9, it sounds like. I did not note that this issue was raised, and I accept that it might be, but I do not know for sure. Sure. With respect to the heart of this matter, what happened here and why there is a violation of paragraph 14 is that what the Secretary did was to draw all of the provisions of option 1, average acquisition cost rate setting, into paragraph 2. The rule acknowledges that this was set this way to, quote, better represent the average acquisition cost. Option 1 prevents the use of that measure unless requisite data is available and it's conceded that it's not. And option 2, the average sales price, requires the use of a market price across the country that can be adjusted for things like overhead, but does not permit a special rate to be set for a subgroup of hospitals as option 1 does. So nominally, in words, the Secretary used average sales price terminology, but substantively, in fact, and it's evident on the face of the rule, the Secretary used the authority in option 1 to set rates for subgroups and used the authority in option 1 to use acquisition cost. The scheme as a whole seems to prefer a measure of cost rather than price, right? It doesn't say use cost or price. It says you must measure by cost if cost data are available, and if not, measure by price and make adjustments, right? Yes, option 1 is to be used if the data are available. So even in the face of imperfect cost data, why would it be beyond the scope of the statute or arbitrary and capricious for the Secretary to say, I may not know exactly what the cost data are, but we know that price overstates cost and cost is the preferred measure, and so we want to move the compensation in that direction. Option 1 requires very rigorous data and I think shows Congress's skepticism that the rate should actually be set. Certainly, it should not be set. The Secretary should not use acquisition cost in the absence of rigorous data. Here, the Secretary not only lacked the rigorous data but was using estimates. We don't know that the result would come out the same in calculations under both options. What we do know is that- No, but adjustment is a question of degree, right? And so, I mean, if he adjusts it down to zero, you've got a compelling argument that that's not an adjustment. Well, it's not just- But if he adjusts it- So you can't say- You can't just rest on adjustment doesn't mean eliminate. So you need some notion of, well, this adjustment is undermining the purpose of the program, targets the program, I think is the language you use. And that just seems like a little bit of a tough case where what he's targeting and aiming at is a price measure or a compensation measure that's explicitly contemplated in the statute. The degree to which- This was a 28.5% reduction and it was so huge and unprecedented because the intention was not to use average sales price. The intention was to make whatever adjustment was necessary to end up at acquisition costs impermissibly and notably to apply that to one subgroup of hospitals and not to the other participants in the OPPS system. Option one permits that, but option two doesn't, and it disadvantages the hospitals. We have an apples and oranges calculation where the discounts to 340B hospitals are taken into account, but the discount to all the other hospitals who may have negotiated substantially large discounts are not taken into account. You're really cutting the pie up using different measures for different people, and it's particularly inappropriate where it affects negatively the hospitals that provide care to the poor. Thank you, counsel. Case is submitted.
judges: Srinivasan, Millett, Katsas